# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

THE MOSES H. CONE MEMORIAL ) 
HOSPITAL OPERATING )
CORPORATION d/b/a CONE )
HEALTH, )
                     )
         Plaintiff, )
                     )
       v. )           1:13CV651
                     )
CONIFER PHYSICIAN SERVICES, INC.)
f/k/a SPRINGFIELD SERVICE )
CORPORATION, )
                     )
         Defendant. )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Plaintiff, The Moses H. Cone Memorial Hospital Operating Cooperation's ("Cone Health") motion for partial summary judgment (Docket Entry 100), and Defendant Conifer Physician Services, Inc.'s ("Conifer") motion for partial summary judgment. (Docket Entry 103.) Both matters have been fully briefed and are ripe for disposition. For the reasons stated herein, the Court will deny Conifer's motion for partial summary judgment and grant in part and deny in part Cone Health's motion for partial summary judgment.[1]

---

[1] By consent of the parties, this matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(c), to conduct all proceedings including a jury or nonjury trial, to order the entry of judgment, and to conduct all post-judgment proceedings therein. (*See* Docket Entry 59.)

# I. BACKGROUND

Cone Health filed its original complaint on August 8, 2013, alleging that Conifer breached the parties' Master Outsourcing Services Agreement and Supplement 1 ("Agreement") and that Cone Health was terminating the Agreement as a result of Conifer's breach. (*See generally* Compl., Docket Entry 1.) Cone Health alleged a claim for breach of contract (and the supplement) (Counts I and II), and also alleged five separate causes of action for declaratory judgment (Counts III through VII). (*Id.* ¶¶ 75-96.) Conifer filed a motion to dismiss Counts III through VII of the Complaint. (Docket Entry 10.) The Court thereafter granted Conifer's motion (Docket Entry 27), and the parties submitted a Joint Rule 26(f) Report which the Court adopted. (Docket Entries 28, 30.) After discovery commenced, Cone Health filed a consent motion to amend its Complaint, which was granted. (Docket Entries 39, 42.) After the Amended Complaint was filed (Docket Entry 45), Conifer answered and asserted a counterclaim against Cone Health. (Docket Entry 48.) Thereafter extensive discovery took place in this matter and both parties submitted motions for partial summary judgment. (Docket Entries 100, 103.) In its motion, Cone Health seeks partial summary judgment as to damages on Conifer's counterclaim. (Docket Entry 100.) Conifer's motion seeks partial summary judgment as to: (1) liability on its counterclaim, (2) all claims for relief in Cone Health's Amended Complaint except the claim for a performance adjustment; (3) and other relief the Court finds appropriate. (Docket Entry 103.)

According to the Amended Complaint, Cone Health provides health care services through a network of hospitals and physicians in North Carolina. (Am. Compl. ¶ 5, Docket Entry 45.) Conifer provides revenue management, health information management, and

billing services to health care providers like Cone Health.[2] (*Id.* ¶ 6.) On August 8, 2011, Cone Health and Conifer entered into a Master Agreement (the "Agreement") under which Cone Health outsourced certain claims management and accounts receivable functions to Conifer. (*Id.* ¶¶ 9-10; Master Agreement & Supplements, Ex. A, Docket Entry 45-1.) Thereafter, the parties executed "Supplement 1" to the Agreement, under which Conifer began providing billing and claims management services to physicians owned by, or affiliated with, Cone Health. (Suppl. 1, Ex. A at 32-33.) The term of the Agreement under Supplement 1 was five years from the commencement date of Supplement 1. (*Id.* at 32.)

On May 10, 2013, Cone Health notified Conifer of several purported breaches of the Agreement and threatened to terminate it for cause as of July 12, 2013. (Am. Compl. ¶ 58; *see also* May 10 Letter, Ex. A, Docket Entry 51-1.) The alleged breaches include Conifer's failure to properly manage Cone Heath's accounts receivable ("A/R"), failure to implement a denial management team to process denied claims, failure to provide adequate customer service to patients, failure to provide daily reconciliation, and improper billing of Medicaid beneficiaries. (*Id.* ¶¶ 19-54.) Under the Agreement, Cone Health (with written notice) could terminate the Agreement for cause if Conifer failed to fix a material breach within sixty (60) days, or Cone Health could terminate if a material breach was incurable. (*Id.* ¶ 56; Master Agreement § 15.2(a).) The Agreement also provided for termination without cause at any time after the three-year anniversary of the Agreement, provided that Cone Health give six (6) months written notice. (Master Agreement § 15.2(c).) After receiving notice of Cone Health's intent

---

[2] Conifer is formerly known as "Springfield Service Corporation" which did business as "SPi Healthcare." (Am. Compl. ¶ 7.) The Amended Complaint refers to Defendant as "SPi". This memorandum opinion refers to Defendant as "Conifer".

to terminate the Agreement, Conifer responded by letter, addressing the issues in the notice from Cone Health. (Am. Compl. ¶ 59; *see also* May 30 Letter, Ex. B, Docket Entry 51-2.)

Cone Health concluded that Conifer did not have the ability to cure its breaches, nor had Conifer remedied the issues raised in the May 10 letter. (*Id.* ¶ 60.) Cone Health agreed to suspend its termination notice until August 12, 2013, to allow the parties to discuss termination transition resolutions. (*Id.* ¶ 63.) Cone Health then filed this action on August 8, 2013, alleging that Conifer breached the Agreement.

Conifer filed an Answer and also asserted a counterclaim in this action alleging that Cone Health's termination was improper, and thus, a breach of the Agreement. (Counterclaim ¶ 3, Docket Entry 48 at 7.) Conifer alleges that it was (1) never in material breach of the Agreement and (2) that it cured, or offered to cure any purported breach before Cone Health terminated the Agreement. (*Id.*) Conifer seeks compensatory damages in excess of $20 million dollars. (*Id.* ¶ 46.)

Some background undisputed facts are as follows:[3] Cone health was initially struggling with revenue cycle performance prior to the execution of the Agreement. (Kenneth Boggs Dep., Ex. 5 47:5-48:5, Docket Entry 105-4 at 7.) Revenue cycle functions include scheduling, registration, billing for medical services, collecting payment, account adjustments, and collections follow-up. (Ex. 2, Docket Entry 105-1 at 33.) Cone Health's in-house struggles with billing and collection services were primarily the result of staffing issues. (Boggs Dep.,

---

[3] Both parties have presented extensive evidence, including corporate documents, affidavits and deposition testimony which demonstrate an extensive historical working relationship from a time period prior to the execution of the Agreement through the filing of this civil action. The Court need not narrate every detailed factual allegation as the parties are intimately familiar with such information. To the extent necessary, the Court will address facts pertinent to the legal arguments presented herein.

Ex. 5 47:8-12.)  In 2010, Cone Health decided to change its electronic healthcare records system from the "GE/IDX" platform to the "EPIC" platform. (Mark R. Gorham Dep., Ex. 6 44:19-25, Docket Entry 105-4 at 16.)  EPIC was set to go "live" on February 1, 2012. (*Id.* 73:12-19.)  As part of Cone Health's efforts to improve revenue cycle functions, it also entered into the Agreement with Conifer.  Conifer begin services on the GE/IDX system and later moved to the EPIC system. (*See* Suppl. 1, § VI.)  Conifer's services included A/R follow-up, payment posting, and customer service. (Ex. 8, Docket Entry 105-4 at 65-66.)  Cone health was still responsible for some revenue cycle functions. (*Id.*)

What transpired (and why it transpired) after Conifer begin performing under the Agreement is the root of considerable disagreement, but it is clear that by early 2013, Cone Health was unsatisfied with Conifers' performance and intended to terminate its agreement with Conifer.  Cone Health hired another revenue cycle management company in March 2013, Alleviant, and on April 18, 2013, a Cone Health executive, Jeffrey F. Jones, contacted Conifer's executive, John O'Donnell, regarding terminating the Agreement. (Jeffrey Jones Dep., Ex. 76 271:1-272:20:, Docket Entry 121-15 at 13-14.)  Mr. O'Donnell wanted something in writing and on May 10, 2013, Mr. Jones sent a letter to Conifer regarding Cone Health's grounds for termination. (May 10 Letter at 2-3.)  Thereafter, Conifer provided a response to the issues raised in the letter whereby Conifer denied that Cone Health could terminate the Agreement with cause. (May 30 Letter at 2-7.)  Cone Health wrote a follow-up letter on June 14, 2013 expressing further disagreement.  (June 14 Letter, Ex. C, Docket Entry 51-3.)  Cone Health then filed the pending action against Conifer in August 2013.

## II. DISCUSSION

Both parties have moved for partial summary judgment in this matter. (Docket Entries 100, 103.) Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex*, 477 U.S. at 331 (Brennan, dissenting). When making the summary judgment determination, the Court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997). However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *Anderson,* 477 U.S. at 248-49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted).

## Conifer's Motion for Partial Summary Judgment

Conifer seeks partial summary judgment as to: (1) liability on its counterclaim, (2) all claims for relief in Cone Health's Amended Complaint (except the claim for a performance adjustment); (3) and other relief the Court finds appropriate. (Docket Entry 103.) Cone Health argues that Conifer's motion should be denied because "there is a question of fact for the jury as to whether [Conifer] has cured, could cure, or was even trying to cure its material breach at the time of termination." (Pl.'s Resp. Br. at 24, Docket Entry 118.)

The parties do not dispute that the any alleged breach of the Agreement is governed by North Carolina law. To establish liability for a breach of contract claim under North Carolina law, there must be (1) an existing valid contract and (2) breach of the terms of that contract. *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). Neither party here is in dispute as to whether a valid contract existed. However, the crux of this case surrounds the ultimate determination of whether Conifer or Cone Health breached the Agreement. Under North Carolina law, when one party materially breaches a bilateral contract, the non-breaching party is excused from further performance. *McClure Lumber Co. v. Helmsman Constr., Inc.*, 160 N.C. App. 190, 198, 585 S.E.2d 234, 239 (2003); *Lake Mary Ltd. P'ship v. Johnston*, 145 N.C. App. 525, 537, 551 S.E.2d 546, 555 (2001); *Coleman v. Shirlen*, 53 N.C. App. 573, 577–78, 281 S.E.2d 431, 434 (1981). "Whether a breach is material or immaterial is ordinarily a question of fact." *McClure Lumber*, 160 N.C. App. at 198, 585 S.E.2d at 239 (citation omitted).

"Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." *State v. Philip Morris USA Inc.*, 363 N.C. 623, 631–32, 685 S.E.2d 85, 90–91 (2009) (citation omitted). Thus, "[i]f the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." *Walton v. City of Raleigh,* 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996).

*Liability*

As a threshold issue, the Court must first determine the scope of this suit. Here, Cone Health alleges that Conifer has breached § 11.2 of the Agreement which sets forth the performance of services that Conifer has obligated itself to. (*See* Master Agreement § 11.2.) Cone Health further asserts that it rightfully terminated under § 15.2(a), and that Conifer's alleged breach should not be narrowed to the six specific violations set forth in the letters dated May 10, 2013 and June 14, 2013, as the basis of Cone Health's termination was for Conifers' failure to effectively manage the A/R, "its fundamental responsibility under the [Agreement]." (Pl.'s Resp. Br. at 25.) Under the Agreement, Cone Health (with written notice) could terminate the Agreement for cause if Conifer failed to fix a material breach within sixty (60) days, or if a material breach was incurable. (Master Agreement § 15.2(a).) By letter dated May 10, 2013, Cone Health informed Conifer of its intent to terminate the Agreement for its breach of its warranties of performance set forth in § 11.2. (May 10 Letter at 2.) Cone Health further stated "[t]he specific conduct that constitutes [Conifer's] breach includes, without limitation:" (1) Conifer's management of A/R days trending was well below industry standards; (2) Conifer failed to assign a dedicated denial management team; (3) Conifer has failed to provide daily reconciliations; (4) Conifer failed to get approval and give prior notice

of write-offs; and (5) Conifer improperly engaged in balance-billing. (*Id.*) In closing, Cone Health further stated that "[t]ermination of the Agreement will be effective on July 12, 2013 unless [Conifer] has fully cured all breaches to Cone Health's satisfaction before that date." (*Id.* at 3.)

North Carolina law generally enforces valid notice and cure clauses in a contract. *Dishner Developers, Inc. v. Brown*, 145 N.C. App. 375, 378, 549 S.E.2d 904, 906, *aff'd*, 354 N.C. 569, 557 S.E.2d 528 (2001); *see also Jordan's Constr., Inc. v. Forest Springs, LLC*, 738 S.E.2d 454, 2013 WL 601112, at *2 (N.C. Ct. App. Feb. 19, 2013) ("There is no evidence in the record indicating that defendant provided plaintiff with written notice of plaintiff's breach of the contract and the right to cure as required by the Agreement."). While the Court recognizes the language of Cone Health's May 10 letter, including its "without limitation" verbiage, a fair reading of § 15.2(a) would require Cone Health to provide Conifer notice of all of the performance deficiencies that required curing, or that could not be cured. Here, Conifer could only be held liable for what it was properly put on notice of and failed to cure, or put on notice of breaches that were incurable. *LCA Dev., LLC v. WMS Mgmt. Grp., LLC*, 789 S.E.2d 569, 2016 WL 3406519, at *2 (N.C. Ct. App. June 21, 2016) (unpublished table decision) ("[T]he default could not be a material breach until after [defendant] was given notice and an opportunity to cure-were it otherwise, the cure provision in the contract would be meaningless."). Thus, the scope of this civil action is limited to breaches of the Agreement

which Conifer was put on notice[4] to cure, or breaches which Cone Health gave written notice that were incurable.

Having considered the evidence presented with regard to issues raised in Cone Health's letters, the Court concludes that there is a genuine issue of material fact as to whether Conifer cured the violations set forth in Cone Health's notice letter, or whether there were breaches that could not be cured. North Carolina Court law looks at the Restatement (Second) of Contracts for guidance on cure issues. *Weaver's Asphalt & Maint. Co. v. Williams*, 710 S.E.2d 709, 2011 WL 705150, at *4 (N.C. Ct. App. Mar. 1, 2011) (unpublished table decision) (quoting Rest. 2d § 237 cmt. B (1981)); *see also Reeder v. Carter*, 226 N.C. App. 270, 276, 740 S.E.2d 913, 918 (2013) (quoting Rest. 2d § 369 (1981)). Cases from other jurisdictions applying Restatement (Second) of Contracts § 237 have found that a party in breach does not cure unless it begins to substantial perform its contractual obligations. *See e.g., Anacapa Tech., Inc. v. ADC Telecommunications, Inc.*, 241 F. Supp. 2d 1016, 1019-20 (D. Minn. 2002) ("While case law on the question [of what is means to cure] is sparse, it is clear that to cure a material breach means to engage in subsequent conduct that substantially performs or performs without a material failure."); *see also Volvo Trucks N. Am. v. State Dep't of Transp.*, 323 Wis. 2d 294, 314, 779 N.W.2d 423, 433 (2010) ("A reasonable interpretation of the statutory word 'cured' means the breaching party is to stop the offending conduct and to substantially perform the contract.

---

[4] A North Carolina court, in analyzing a contract suit under New York law, found similarly that the scope of proper termination was determined by the specific issues in the notice. *Bayer CropScience LP v. Chemtura Corp.*, No. 12 CVS 3057, 2012 WL 2878174, at *5 n.44 (N.C. Super. July 13, 2012) (unpublished). It held that "the newly alleged breaches cannot support [defendant's] termination of the [parties'] Agreement, and the court will only look to the issues raised by [defendant] in the Notice to determine whether [defendant's] termination of the [parties'] Agreement was proper." (*Id.*)

No other interpretation of the word 'cured' is more reasonable."); *Fleetwood Folding Trailers, Inc. v. Coleman Co.*, 38 Kan. App. 2d 30, 43, 161 P.3d 786, 798 (2007) (considering "substantial performance" described in *Anacapa*). "Cure does not require perfect performance. *Anacapa*, 241 F. Supp. 2d at 1020. Here, under § 15.2(a)(i) of the Agreement, Cone Health could properly terminate the contract if Conifer failed to cure to a level of substantial performance. Also, Cone Health could terminate the Agreement pursuant to §15.2(a)(ii) if it gave written notice of breaches that could not be cured.

After reviewing the evidence presented, it is unclear whether Conifer substantially performed, thereby curing the purported breach of the warranties of performance. Substantial performance of the issues raised in Cone Health's correspondence are collectively germane to this breach of contract action, and the determination of such performance is a question of fact for the jury. For example, one of the issues raised in the May 10 letter included Conifer's failure to designate "a dedicated denial management team to review and resolve Cone [Health's] denials." (May 10 Letter at 2.) The specific contractual provision referenced is paragraph V.8 of the Supplement, which indicates that the "[d]enial claims will be reviewed by specific teams dedicated to the resolution of certain types of denials." (Suppl. 1 ¶ V.8, Docket Entry 45-1 at 32.) This clause is ambiguous as to whether special denial teams were required to deal with the denial claims, or if Conifers current team structure met the terms of the agreement. Conifer argues that though it did not have to implement special teams,[5] it offered, in its May 30 response letter, to make the necessary adjustments to Cone Health's satisfaction. (May 30

---

[5] Cone Health also submits evidence that Conifer's representatives acknowledged that a specific denial management team was necessary. (*See* Andrea Mendoza Dep. Ex. 78 75:6-76:7, Docket Entry 121-17 at 8-9.) Conifer's objections to the use of this deposition testimony is overruled.

Letter at 4.) In a deposition, Cone Health's Vice President of Revenue Cycle, Michael Simms admitted that he did not personally respond, and that he could not recall, nor give an answer to whether anyone from his staff told Conifer to implement a dedicated denial staff. (Simms Dep., Ex. 15 135:5-136:25, Docket Entry 105-7 at 32.) The June 14 letter by Cone Health did further discuss the denial team management issue, and concluded by "demand[ing] that [Conifer] immediately designate and implement a dedicated denials team that is completely separate from . . . the existing 55-member collections team." (June 14 Letter at 3.) Yet, in a further response dated August 8, 2013, Conifer again indicated that it was "ready, willing, and able to make this change immediately upon receiving instruction to do so from Cone [Health]." (August 8 Letter, Ex. 31, Docket Entry 105-9 at 22.) These facts all present a genuine issue of whether substantial performance has been met. Likewise, there are other disputed facts raised regarding other issues in the May 10 letter. There are also genuine issues of material fact as to alleged breaches that could not be cured, for example, as Cone Health sets forth in its June 14, 2013 letter. (*See* June 14 Letter at 2-4.) Such issues preclude summary judgment in favor of Conifer as to liability on its counterclaim and as to Cone Health's claims in the Amended Complaint.

To the extent Conifer seeks partial summary judgment as to certain grounds for the alleged breach of contract, the Court finds that this is improper under Federal Rule of Civil Procedure Rule 56. Rule 56 permits a party to "move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought." Fed. R. Civ. P. 56(a). Partial summary judgment is permitted (e.g., finding of liability, the issues of damages); however, this rule is improper as to what Conifer seeks; that is, a

pruning of factual allegations related to Cone Health's sole breach of contract claim (which raises several grounds of termination).[6] Conifer opposes Cone Health's argument and relies upon the 2010 Comment Notes of Rule 56(a), which "make[s] clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense." Fed. R. Civ. P. 56(a), 2010 Comm. Notes. The Court agrees that disposition of less than an entire action is permissible under the Rule. However, to piecemeal and separately decide each ground for which Cone Health brings its claim, which is the root of liability in this breach of contract action pursuant to one provision in the parties' agreement, does not serve the best interest of justice here.[7] Indeed, the case cited by Cone Health supports this position. *Cardenas v. Kanco Hay, L.L.C.*, No. 14-1067-SAC, 2016 WL 3881345, at *7 (D. Kan. July 18, 2016) (unpublished) ("There may be parts of claims, such as liability, upon which a motion for partial summary judgment may be granted.").[8]

*Damages – "Reasonable Certainty" Standard*

Conifer also asserts that Cone Health's principal damages fail under the "reasonable certainty" standard. (Def.'s Br. at 22.) Cone Health argues that its damages are reasonably

---

[6] The Amended Complaint sets forth two counts, one for breach of the Agreement, and one for breach of the supplement. (*See* Am. Compl. ¶¶ 64-72.) There is no dispute that the parties were operating under one single contract.

[7] This also applies to Conifer's argument regarding Cone Health's disclosure (or lack thereof) of damages. (*See* Def.'s Br. at 26-27, Docket Entry 104.)

[8] *Cardenas* further stated that "[liability] is a much larger aspect or 'element' of plaintiff's negligence claim than the issues raised in plaintiff's motion. Plaintiff's motion asks the court to make piecemeal findings on matters which . . . does not promote a just, speedy or inexpensive determination of this dispute." 2016 WL 3881345, at *7. *See also Boykin Anchor Co. v. AT & T Corp.*, 825 F. Supp. 2d 706, 709 (E.D.N.C. 2011) (applying similar principle under Rule 12(b)(6) standard) ("The court also declines to accept defendant's invitation to dismiss the libel claim 'in part,' which appears to the court to be little more than an attempt to dispose of an *allegation* rather than the underlying claim.").

certain and not speculative. (Pl.'s Resp. Br. at 29.) A "party seeking damages must show that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty." *Olivetti Corp. v. Ames Bus. Sys., Inc.*, 319 N.C. 534, 547–48, 356 S.E.2d 578, 586 (1987). "In cases where a claim for damages from a defendant's misconduct are shown to a reasonable certainty, the plaintiff should not be required to show an exact dollar amount with mathematical precision." *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 174 N.C. App. 49, 61, 620 S.E.2d 222, 231 (2005). However, damages may not be "based upon mere speculation or conjecture." *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 379, 542 S.E.2d 689, 694 (2001). The burden is on the party seeking damages to show that the reasonable certainty standard is met. *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 660, 670 S.E.2d 321, 330 (2009). "Whether a party's evidence meets the 'reasonable certainty' standard is a question of law for the court." *Ross v. Washington Mut. Bank*, 566 F. Supp. 2d 468, 482 (E.D.N.C. 2008), *aff'd sub nom. Ross v. F.D.I.C.*, 625 F.3d 808 (4th Cir. 2010) (citation omitted).

Here, "[to] estimate its damages, Cone [Health] applied an historical gross collection rate ("GCR") to an extrapolated amount of AR that was written off due to Conifer's breach." (Pl.'s Resp. Br. at 29.) The basis for the GCR is set forth in the affidavit of David Wofford. (Wofford Aff., Ex. 124, Docket Entry 124-12.) According to Wofford, the GCR is "simply the amount actually collected during the time period in question, divided by the total amount of all charges (both Collectible Charges and Uncollectible Charges)." (*Id.* ¶ 11.) Conifer takes issue with this calculation because it would include "Clean Claims" which are claims Conifer would not have worked on. Conifer worked on "Problem Claims." (David Wofford Dep.,

Ex. 36 303:23-306:4, Docket Entry 105-9 at 57-58.) Wofford noted that "[p]resumbly, the collection rate for the A/R under its management should be lower than the overall gross collection rate because [Conifer] only managed 'Problem Claims.'" (Wofford Aff. ¶ 7.) However, Wofford also expressed the problems with solely categorizing Clean verses Problem Claims, and also stated that the GCR "takes into account, over an extended period of time, all of the various factors that lead to a physician practice not collecting 100% of its charges." (*Id.* ¶¶ 8, 14.) Wofford further stated that this application was "an extremely conservative calculation method." (*Id.* ¶ 16.)

Based upon the calculation method used here, the Court cannot conclude as a matter of law that Cone Health's damages are purely speculative and not reasonably certain. The historical collection rate used here is distinguishable from the collection method rejected in *Managed Care Prof'ls, Inc. v. Medlantic Healthcare Grp.*, 164 F.3d 624, 1998 WL 704458, at *7 (4th Cir. Oct. 1, 1998) (unpublished table decision).[9] In that case, the plaintiff predicted its damages based upon collection rates from prior dealings with another health care provider and a different third-party payor. *Id.* at *6-7. The Court also noted that the plaintiff failed to perform "detailed account-by-account reviews." *Id.* at *7. Here, Cone Health's damages calculation did not include another health care provider and based upon the expert's explanation of the method used, the application of the historical GCR should allow the fact-finder to calculate damages with reasonable certainty. Thus, Conifer's motion for partial summary judgment as to Cone Health's damages fail.[10]

---

[9] This case applied Virginia law.
[10] The Court overrules Conifer's objections to the use of Wofford's affidavit.

## Cone Health's Motion for Partial Summary Judgment

Cone Health seeks partial summary judgment as to damages on Conifer's counterclaim for two reasons: (1) Conifer is barred from recovering lost profits; and (2) if Conifer is entitled to lost profits, such damages should be limited to those occurring prior to August 9, 2014. (Pl.'s Br., Docket Entry 101.) Conifer argues to the contrary, asserting that it seeks damages for *direct* lost profits which are not barred under the Agreement, and that it is entitled to damages accrued through January 31, 2017. (Def.'s Resp. Br., Docket Entry 117.)

As to Cone Health's first argument, it relies upon a provision in the Agreement regarding the disclaimer of indirect damages. Section 14.2 of the Agreement states:

> **Disclaimer of Indirect Damages**. Neither party shall be liable to the other party for indirect, incidental, consequential, exemplary, punitive or special damages, *including lost profits,* regardless of the form of the action or the theory of recovery, even if such a party has been advised of the possibility of such damages, but such limitation shall not apply to a breach of the business associate agreement (BAA) between the parties.

(Master Agreement § 14.2) (emphasis added)). Cone Health argues that this provision excludes all damages for lost profits, whether direct or indirect. (Pl.'s Br. at 8.) Conifer asserts that a plain reading of § 14.2 of the Agreement leads to only one conclusion that the lost profits language set out in the provision solely pertains to *indirect* loss profits, thus Conifer's loss profits that are direct damages are not barred. (Def.'s Resp. Br. at 10.)

As previously stated, plain and unambiguous language of a contract controls and the intention of parties is inferred from the words of the contract. *Philip Morris*, 363 N.C. at 631-32, 685 S.E.2d at 90 (citation omitted). Here, the clear language of § 14.2 leads to only one appropriate interpretation that the parties are barred from recovering only indirect lost profits,

thus Conifer's claim for damages resulting from direct lost profits are recoverable under the Agreement.

To reach this conclusion, the Court looks at the language of § 14.2 as a whole, and with particularity, the words "*including* lost profits." (Master Agreement § 14.2) (emphasis added)). This language is preceded by a list of excludable damages: "indirect, incidental, consequential, exemplary, punitive or special damages." (*Id.*) Interpreting a statutory provision, the North Carolina Court of Appeals has relied upon general dictionary definitions to the word "including":

> *The New Oxford American Dictionary* defines the word "including" to mean "containing as part of the whole being considered." *The New Oxford American Dictionary* . . . . Similarly, *Black's Law Dictionary* explains, "The participle including typically indicates a partial list." *Black's Law Dictionary* 831 (9th ed. 2009).

*State ex rel. Utilities Comm'n v. Envtl. Def. Fund*, 214 N.C. App. 364, 367, 716 S.E.2d 370, 372 (2011). In applying another the statutory provision, the Supreme Court of North Carolina stated that "[c]learly, by use of the word 'including' the lawmakers intended merely to *list* examples[.]" *N. Carolina Tpk. Auth. v. Pine Island, Inc.*, 265 N.C. 109, 120, 143 S.E.2d 319, 327 (1965) (emphasis added). Thus, the sole reasonable interpretation of "lost profits" in § 14.2 is that the term is an example of the preceding list of excludable damages, all of which are indirect and consequential in nature such that none necessarily flow immediately from the breach. *See e.g.*, *Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C. App. 650, 671, 464 S.E.2d 47, 62 (1995) (citation omitted) (emphasis in original) ("Consequential or special damages for breach of contract are those *claimed to result as a secondary consequence of the defendant's non-performance*. They are distinguished from general damages, which are based on the value of the performance itself, not on the value of some consequence that performance may produce.");

*Piedmont Plastics, Inc. v. Mize Co.*, 58 N.C. App. 135, 140, 293 S.E.2d 219, 223 (1982) (citing *Rodd v. Drug Co.*, 30 N.C. App. 564, 568, 228 S.E.2d 35, 38 (1976) ("Incidental and consequential damages are 'special damages, those which do not necessarily result from the wrong.'")). Because § 14.2 precludes recovery of *indirect* lost profits and Conifer seeks *direct* lost profits from any damages incurred, Cone Health's motion for partial summary judgment on this issue fails.

Cone Health's reliance upon two North Carolina federal district court cases is misplaced. In *Troche v. Bimbo Foods Bakeries Distribution, Inc.*, the defendant argued that the damages provision in the parties' contract precluded the plaintiff from recovering lost profits of any kind. No. 3:11-CV-234-RJC-DSC, 2016 WL 5417203, at *3 (W.D.N.C. Sept. 27, 2016) (unpublished). The plaintiff argued to the contrary, asserting that the lost profits preclusion was limited to indirect and consequential damages. (*Id.*) That court concluded that "the clear language of the [damages provision] leads to only one reasonable interpretation: [p]laintiff is prohibited from recovering [any] lost profits." (*Id.*) In holding that the contract barred all damages resulting from lost profits, *Troche* appears to rely on two cases, one with a similar damages provision as the one in *Troche*, and one with a comparable damages provision. *Id.* at *3-4. Both are unpersuasive here. In *Carr v. Wal-Mart Stores, Inc.*, applying New York law, that court held that the agreement between the parties "clearly states that 'lost profits' cannot be recovered." No. 10-CV-6176 CJS, 2011 WL 939168, at *5 (W.D.N.Y. Mar. 16, 2011) (unpublished). That court disagreed with the "[p]laintiff['s] focus[ ] on the clause's reference to 'consequential, incidental, indirect' damages," and it also appears that no consideration was given to the dictionary definition of "including" which preceded the list of disclaimed damages

(indirect, incidental, consequential, and special damages). *Id.* at * 1, 5.[11] In a separate unpublished order, this Court, applying North Carolina law, held that "the plain language of [the damages clause in the parties' agreement] clearly states that consequential damages are excluded, that incidental damages are excluded, and that lost profits, regardless of whether they are characterized as consequential damages or direct damages, are excluded." Order at 3, *Ada Liss Grp. v. Sara Lee Branded Apparel*, No. 1:06-CV-610 (M.D.N.C. Dec. 28, 2007). However, the provision at issue in *Ada Liss* included language whereby the parties agreed to exclude "incidental or consequential damages *and/or* any claims for lost profits." *Id.* at 2-3 (emphasis added). Such language is distinguishable from the present case.

Although not controlling, the facts here are more akin to the Tenth Circuit Court of Appeals' holding in *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151 (10th Cir. 2007). In a breach of contract action, the defendant argued that the plaintiff was not entitled to lost profits based upon a provision in the parties' agreement forbidding "the recovery of 'consequential damages,' specifying that they 'include, but are not limited to, lost profits, lost revenues and lost business opportunities.'" *Id.* at 1155–56. That court gave consideration to the dictionary definition of "to include:

---

[11] Notably, four years after the decision in *Carr*, the Western District of New York, in applying New York law, held that a disclaimer provision in a contract did not include direct lost profits sought by the defendant. *Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*, 112 F. Supp. 3d 83, 103 (S.D.N.Y. 2015). That court found that the provision at issue

> exculpates the parties from liability for "special, incidental, consequential, indirect, punitive or exemplary damages *including but not limited to* ... lost profits." . . . The term "lost profits" as it is used here, clearly refers to an example of losses that fall within the six categories of damages expressly excluded by the [agreement]. These categories, in turn, clearly refer to damages beyond those flowing directly from the [agreement].

*Id.*

> The dictionary underscores the point. Webster's defines the term "to include" as meaning "to place, list, or rate as a part or component of a whole or of a larger group, class, or aggregate." *Webster's Third New International Dictionary* 1143 (2002). The more general term informs the subsequently listed examples, not the other way around, and so lost profits here refer only to those that are "a part or component" of the larger group or class of consequential damages.

*Id.* at 1156 (10th Cir. 2007). The court interpreted the contract clause to say "that no consequential damages are recoverable, 'includ[ing]' lost profits; it simply does not speak to direct damages, or to lost profits recoverable under such a theory." *Id.*[12] The provision[13] here is similar in that it forbids recovery of lost profits resulting from the preceding listed categories, none of which are direct damages. Thus, Conifer's claim for lost profits flowing from direct damages is not barred. *See Martin v. Bimbo Foods Bakeries Distribution, Inc.*, No. 5:14-CV-17-BR, 2016 WL 5173249, at *2 (E.D.N.C. Sept. 21, 2016) (unpublished) (holding that Pennsylvania law had not definitively addressed a similar liability limitation issue; therefore, citing *Penncro*, the court held that "[i]t is [only] the recovery of lost profits which are considered consequential, incidental, indirect, or special damages that is precluded" and not all lost profits); *EMS, Inc. v. Chegg, Inc.*, No. 8:11CV113, 2012 WL 5412956, at *5 (D. Neb. Nov. 6, 2012) (unpublished) (applying Nebraska law and holding that "the limitation of liability provision draws a distinction between direct and indirect damages and excluding coverage of the latter [such that] [u]se of the phrase 'but not limited to' when listing examples of consequential, indirect, or incidental damages indicates that lost profits can be an example of

---

[12] The court in *Penncro* was applying Kansas law.

[13] Cone Health argues, and this Court agrees, that the headline, "Disclaimer of Indirect Damages", should be given no effect. (*See* Pl.'s Reply, Docket Entry 101 at 3 n.1; *see also* Master Agreement § 16.8) (emphasis added)). Notwithstanding such, the plain language of the contract clause makes it clear that the damages disclaimed within are indirect damages.

such damages"); *In re First Magnus Fin. Corp.*, No. ADV.09-00381-JMM, 2010 WL 6452904, at *5 (B.A.P. 9th Cir. Aug. 31, 2010) (unpublished) (finding that "the plain language of [the contract] unambiguously restricts damages from lost profits in the context of incidental, punitive, indirect, special or consequential damages" but did not forbid collection of profits resulting from a direct breach); *Coremetrics, Inc. v. Atomic Park.com, LLC*, No. C-04-0222 EMC, 2005 WL 3310093, at *4 (N.D. Cal. Dec. 7, 2005) (unpublished) (applying California law and finding that "the Limitations on Damages clause is unambiguous and contemplates a bar on recovery of indirect damages, not the direct damages [the plaintiff] seeks here").

Having found that Conifer is not barred from seeking lost profits from direct damages resulting from any alleged breach by Cone Health, the Court will address Cone Health's argument that Conifer should be limited to damages incurred prior to August 9, 2014. (Pl.'s Br. at 10-15.) Cone Health relies upon § 15.2(c) of the Agreement to support its argument. The contract provision states:

> **Without Cause**. After the three (3) year anniversary of this Agreement, [Cone Health] may terminate this Agreement without cause at any time with six (6) months written notice.

(Master Agreement § 15.2(c).) Cone Health asserts that Conifer had no expectation that the Agreement would continue beyond the three year anniversary date of August 9, 2014. (Pl.'s Br. at 10.) Conifer argues to the contrary, and asserts that Cone Health is misguided upon the case law which it relies. (Def.'s Resp. Br. at 17-18.)

It has long been established as a general rule under North Carolina law that "[i]n a suit for damages arising out of a breach of contract, the party injured by the breach is entitled to full compensation for the loss and to be placed as near as may be in the position which [the

non-breaching party] would have occupied had the contract not been breached." *Meares v. Nixon Const. Co.*, 7 N.C. App. 614, 622-23, 173 S.E.2d 593, 599 (1970) (citing *Harris & Harris Constr. Co. v. Crain and Denbo, Inc.*, 256 N.C. 110, 123 S.E.2d 590 (1962)). Thus, "the injured party is to be compensated 'for the loss which fulfillment of the contract could have prevented or the breach of it has entailed.'" *Coble v. Richardson Corp. of Greensboro*, 71 N.C. App. 511, 517-18, 322 S.E.2d 817, 822 (1984) (citing *Norwood v. Carter*, 242 N.C. 152, 155, 87 S.E.2d 2, 4 (1955)). "The interest being protected by this general rule is the non-breaching party's 'expectation interest,' and in so doing, the injured party receives the 'benefit of the bargain.'" *First Union Nat. Bank of N. Carolina v. Naylor*, 102 N.C. App. 719, 725, 404 S.E.2d 161, 164 (1991) (citation omitted). Applying North Carolina law, the Fourth Circuit in an unpublished decision held that "when a contract *does* provide a right to cancel with notice the parties must reasonably expect that this right might be exercised[.]" *Strategic Outsourcing, Inc. v. Cont'l Cas. Co.*, 274 F. App'x 228, 235 (4th Cir. 2008) (unpublished).

To support its argument to limit Conifer's damages, Cone Health relies upon its unilateral ability to terminate the contract without cause at the three-year anniversary of the parties' Agreement (with six months' notice). Cone Health argues that Conifer's expectation interest could not have exceeded the scope of the without cause provision. (Pl.'s Br. at 12-13.) The Court first notes that Cone Health terminated the contract pursuant to § 15.2(a) "with cause" rather than "without cause" as § 15.2(c) permits. Additionally, Cone Health terminated the Agreement on August 12, 2013, prior to the three-year anniversary. At that time, even if it had sought to do so, Cone Health could not have unilaterally terminated pursuant to § 15.2(c) because its actions would be have been premature. However, this is not

determinative here. North Carolina case law has held that "the damages recoverable are such as may reasonably be supposed to have been in the contemplation of the parties *when the contract was made.*" *Troitino v. Goodman*, 225 N.C. 406, 412, 35 S.E.2d 277, 281 (1945) (emphasis added) (citation omitted); *see also Weyerhaeuser Co. v. Godwin Bldg. Supply Co.*, 292 N.C. 557, 560-61, 234 S.E.2d 605, 607 (1977) (quoting *Troitino*). Thus, at the time of contracting, Conifer could have no expectation beyond the three year anniversary (with six months' notice). As such, Conifer's damages should be limited to those occurring prior to August 9, 2014.[14] *Strategic Outsourcing*, 274 F. App'x at 235 ("North Carolina law . . . holds that an injured party to a contract of fixed duration may recover damages incurred during the entire contract period when one party prematurely terminates the contract if it does *not* include a cancellation provision.").

In an alternative argument, Conifer asserts that even if the damages are limited, such limitation should be to February 8, 2015 rather than the August 9, 2014 anniversary date. (Def.'s Br. at 23-25.) Conifer relies upon the language of § 15.2(c) and suggests that it "only became operative '*[a]fter* the three (3) year anniversary . . . with six months written notice.'" (*Id.* at 24.) Cone Health argues that this new theory asserted by Conifer is improper and that Conifer has "maintained the position throughout this litigation that Cone [Health] could have terminated the Agreement 'without cause on August 9, 2014.'" (Pl.'s Reply Br. at 9, Docket Entry 135) (citation omitted).

---

[14] Conifer attempts to distinguish Cone Health's supporting cases by arguing that those cases dealt with contract provisions allowing termination *at any time* and also arguing that Cone Health could not have terminated the Agreement *without cause* at the time it improperly breached the Agreement pursuant to the *with cause* provision. (Def.'s Br. at 17-23.) The Court finds these arguments inapposite as they fail to account for Conifer's expectation interest at the time the contract was made.

Here, the Court finds that § 15.2(c) is ambiguous on the issue of when Cone Health could provide notice of its intent to terminate under §15.2(c). "[A] contract [term] is ambiguous when the 'writing leaves it uncertain as to what the agreement was . . . .'" *Barrett Kays & Assocs., P.A. v. Colonial Bldg. Co. of Raleigh*, 129 N.C. App. 525, 528, 500 S.E.2d 108, 111 (1998) (citing *International Paper Co. v. Corporex Constructors, Inc.*, 96 N.C. App. 312, 317, 385 S.E.2d 553, 556 (1989)). *The New Oxford American Dictionary* defines "notice" as "notification or warning of something, esp. to allow preparations to be made." *The New Oxford American Dictionary* 1200 (Elizabeth J. Jewell et al. eds., 3d ed. 2010). Here, the clause is susceptible to more than one interpretation as a reasonable jury could find that Cone Health could give notice six (6) months prior to the anniversary date, or that Cone Health could give notice only after the date of the three-year anniversary. The inquiry does not end here, however.

> Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, *if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis.* If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.

*Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 235 (4th Cir. 2007) (emphasis added) (citing *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993)). Here, Conifer's conduct demonstrates that the intent of the parties was that the earliest Cone Health could terminate the contract (without cause) was on August 9, 2014. One of Conifer's executives indicated that Cone Health court terminate after three years. (John O'Donnell Dep., Ex. B 145:1-3, Docket Entry 101-2 at 5; *see also* Worachek Email, Ex. K, Docket Entry 101-11 (summarizing the contract term as "5 years with the option to terminate

after 3")). Additionally, in its discovery response, Conifer indicated that Cone health had the opportunity to terminate the Agreement "without cause on August 9, 2014, provided that Cone [Health] gave six months' written notice to [Conifer]." (Conifer Interrogatory Response ¶ 28, Ex. H, Docket Entry 101-8 at 3.) One of Conifer's experts also based a portion of his opinion using the August 9, 2014 termination date. (Erik C. Lioy Expert Report, Ex. G, Docket Entry 101-7 at 3.) Thus, the undisputed extrinsic evidence supports the finding that that Conifer is entitled to lost profits, if any, through August 9, 2014.[15] Cone Health's motion for partial summary judgment is granted on this issue.

## III. CONCLUSION

For the reasons stated above, **IT IS THEREFORE ORDERED** that Cone Health's Motion for Partial Summary Judgment (Docket Entry 100) is **GRANTED IN PART AND DENIED IN PART**, and Conifer's Motion for Partial Summary Judgment (Docket Entry 103) is **DENIED**.

Joe L. Webster
United States Magistrate Judge

April 11, 2017
Durham, North Carolina

---

[15] Cone Health also claims that Conifer's representative drafted the Agreement; thus, the contract is strictly construed against Conifer. *Rayfield Aviation, LLC v. Lyon Aviation, Inc.*, No. 1:11CV274, 2014 WL 1320118, at *9 n.15 (M.D.N.C. Mar. 31, 2014), *aff'd* (Nov. 6, 2014) ("Both parties note the well-established interpretive canon that a contract is to be construed strictly against its drafter.").